IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-765

Filed 18 June 2025

Iredell County, No. 21CVS001134-480

NORTH STATE ENVIRONMENTAL, INC., Plaintiff,

v.

TOWN OF MOORESVILLE, Defendant.

Appeal by defendant from judgment entered 10 July 2023 by Judge William Long in Iredell County Superior Court. Heard in the Court of Appeals 8 April 2025.

> *Craige Jenkins Liipfert & Walker LLP, by William W. Walker and Lori B. Edwards, for plaintiff-appellee.*

> *Cranfill Sumner LLP, by Steven A. Bader and Mica N. Worthy, for defendant-appellant.*

ZACHARY, Judge.

Defendant Town of Mooresville ("the Town") appeals from the trial court's judgment awarding Plaintiff North State Environmental, Inc., ("North State") the sum of $132,657.40 plus interest on its claim for breach of contract. After careful review, we affirm.

## I.   Background

We recite only the facts necessary for our analysis. These include the relevant findings of fact made by the trial court, none of which are disputed on appeal.

In 2013, the Town contracted with the North Carolina Department of

Transportation ("NCDOT") to administer a roadway improvement project ("the Project") at an intersection on State Highway 115. "The Project had two principal goals: to realign the intersection; and to install a storm water drainage system under the roads. Installation of the drainage system was the Project's 'controlling operation.' " The contract between the Town and NCDOT provided, *inter alia*, that the Town "and/or its agent, at no liability to [NCDOT], shall relocate, adjust, relay, change or repair all utilities in conflict with the Project, regardless of ownership."

The Town hired the engineering firm Ramey Kemp ("Kemp") to design plans for the Project in 2015. In its contract with the Town, Kemp agreed to "[c]oordinate existing private utility conflicts and relocations required for the proposed improvements with the appropriate utility company" and to "[i]dentify all potential utility impacts caused by the [P]roject and show [the potential utility impacts] on plans prepared for coordination with utility owners."

As the trial court described in its findings of fact, Kemp failed to identify several potential utility impacts:

> 7. Kemp's scope of work included a requirement that it produce information and diagrams in "Utilities By Others Plans" (UBO Plans).
>
> 8. In 2016, Public Service Company of North Carolina/Dominion Energy (Dominion) gave Kemp drawings of its underground gas lines and other facilities in the Project area.
>
> 9. Kemp's "Utility Analysis and Routing Report" dated June 6, 2016, said Dominion's underground gas lines would

not conflict with the Project's drainage system.

10. Kemp failed to identify several Dominion gas lines in conflict with the planned drainage system. In turn, Kemp failed to show all of the Dominion gas lines on the Project plans. And Kemp never produced UBO Plans.

11. Kemp finalized the Project plans on March 12, 2018.

(Internal citations omitted).

On 5 February 2019, the Town awarded the contract for the Project ("the Contract") to North State. The Town subcontracted the construction engineering and inspection work to Stewart Engineering ("Stewart"), which subsequently subcontracted these portions of the Project to A. Morton Thomas and Associates, Inc. ("AMT"). AMT, in turn, named Brenna Stephenson the Project Engineer under the Contract. The Contract included a term ("the Authority of Engineer Term") giving Stephenson, as Project Engineer, the final authority to resolve certain disputes.

The Contract also incorporated, *inter alia*, NCDOT Standard Specification § 105-8, which provided that before beginning construction, the Town was required to "notify all utility owners known to have facilities affected by the construction of the [P]roject and . . . make arrangements for the necessary adjustments of all affected public or private utility facilities." This Standard Specification further provided that "[t]he utility adjustments may be made either before or after the beginning of construction of the [P]roject. The adjustments will be made by the utility owner or his representative or by [North State] when such adjustments are part of the work

covered by [the C]ontract."

Additionally, the Contract incorporated NCDOT Standard Specification § 108-13, which, in pertinent part, authorized the Town to terminate the Contract if it was impossible for North State to complete its contracted work:

> The [Town] may terminate the [C]ontract in accordance with the following provisions:
>
> (A) The [Town] will consider termination of the [C]ontract upon written notification by [North State] that any of the following circumstances exist. [North State] shall include adequate documentation of these circumstances along with such notification:
>
> . . . .
>
> (2) If it is impossible for [North State] to complete the work in accordance with the [C]ontract by reason of unanticipated conditions at the site, including slides and unstable subsoil, without a major change in the design of the [P]roject and [North State] will be unduly delayed in completing the [P]roject by reason of such unanticipated conditions and changes in design . . . .

Before North State began work on the Project, it was informed that there were no anticipated utility conflicts. However, as North State commenced its work, the first utility conflicts were discovered and the first conflicts regarding payment for work on the Project arose between North State and the Town:

> 19. In June 2019, North State's surveyor discovered a sewer line manhole in conflict with the Project fill elevation in the southeast quadrant. The Town installed the new sewer line in the Project area unbeknownst to North State and after North State was awarded the Contract.

- 4 -

20. The first progress meeting was held on site on June 25, 2019. The AMT and North State representatives discussed the poor condition of the road pavement in the Project area, and North State's representative asked for a GIS layout (i.e., a map) of the utilities in the Project area. AMT never supplied North State with a GIS layout of the utilities.

21. In June and July 2019, utility poles prevented North State from bringing fill to the southeast quadrant of the Project. Duke was in the process of moving the poles at that time.

22. North State sent AMT an updated progress narrative on October 3, 2019, and started work on the Project on October 25, 2019.

23. North State installed a construction entrance and temporary traffic control, cleared part of the Project area, and brought in fill materials for the southeast quadrant of the Project.

24. In early December 2019, North State began a planned "jack-and-bore" across and under NC 115. (Jack-and-bore is a procedure used to install pipe under a road without cutting open the road surface.) The plans called for the drainage pipe to run 80 feet and to end in Box 403 at the west side of NC 115 in the Project's southwest quadrant. (A box is a concrete structure, about five feet tall, laid underground to serve as a connection and pivot point for the pipes. The Project plans had four boxes in the drainage system.)

25. The jack and bore could not be completed. AMT realized that the plans showed a gas line running through the 80-foot point – the area in which Box 403 was to be installed – and told North State to stop the bore tunnel at 75 feet. But Box 403 could not [be] installed at the 75-foot point because it would have conflicted with a second gas line – an 8-inch high pressure line that fed Dominion's regulator station in the northwest quadrant.

26. North State submitted its first two pay applications on

January 23, 2020. The Town paid North State $74,254.70 for pay application one and $49,577.50 for pay application two.

27. On January 27, 2020, North State asked AMT to hold bi-weekly meetings with all utility owners to review potential utility conflicts.

28. On February 4, 2020, North State and AMT representatives met on site to discuss the utility conflicts on the Project, which included gas lines, signal poles, power poles, and phone lines that prevented installation of the planned drainage system.

29. On February 17, 2020, North State submitted a third pay application for $61,801.40. The Town did not pay the third pay application.

(Internal citations omitted).

As a result of the utility conflicts, work on the Project was paused, while the impasse between North State and the Town and its subcontractors continued:

30. At a March 3, 2020, progress meeting, North State and AMT agreed that, because of the underground gas line conflicts, North State would demobilize and leave the site and return when the conflicts were resolved. (A supplemental agreement for demobilization and remobilization was discussed but never implemented.)

31. After ensuring erosion control measures were in place, North State demobilized and left the site on March 6, 2020.

32. On March 9, 2020, Kemp sent AMT a revised plan that purported to resolve the Project's gas line conflicts by adding a curb and gutter in the northwest quadrant. North State's supervisor told the [Project E]ngineer the revised plan would not resolve the conflicts. He pointed out that the gas lines in the northwest quadrant still blocked the Project's drainage system — the controlling operation.

33. On March 20, 2020, North State submitted its fourth pay application, requesting $70,856.00.

34. The Town did not pay the fourth pay application.

35. AMT relayed North State's concerns and a drawing to Kemp on April 24, 2020. Kemp's engineer/designer acknowledged that the proposed field adjustment moved boxes in the northwest quadrant to a point where drainage had to flow uphill, but he did not address North State's concerns about the gas line conflicts.

36. The [Project E]ngineer sent North State a concern for progress letter on May 22, 2020, which said in pertinent part "We are currently not aware of any conflicts or issues delaying your work."

37. None of the utility conflicts known to the Town in February 2020 had been resolved by May 22, 2020.

38. The North State supervisor repeatedly expressed concerns to the [Project E]ngineer that Kemp's redesign did not correct the utility conflicts. He repeatedly asked that Kemp and the Town's engineer meet with North State, AMT, and the utility companies to discuss the redesign of the Project and the utility conflicts.

(Internal citations omitted).

The parties reconciled their concerns enough to recommence work on the Project in August 2020, whereupon the utility conflicts immediately resumed:

41. Assured by the [Project E]ngineer that Kemp's redesign would avoid the gas line conflicts, North State remobilized and returned to the Project site on August 20, 2020.

42. As a first step, North State "potholed" in the northwest quadrant, looking for potential gas line conflicts. North State sent photos to AMT along with gas line locations and depths.

43. On August 24, 2020, the [Project E]ngineer told the North State supervisor that North State could file a claim for more time because of the utility conflicts.

44. On August 28, 2020, North State began trying to implement Kemp's redesign by making an open cut on Campus Lane to install part of the drainage system.

45. The AMT inspector on site stopped the operation when he determined that the Dominion 8" high pressure gas main was still in direct conflict with the projected location of Box 403 in the southwest quadrant.

(Internal citations omitted).

The resurfaced utility dispute brought the Project to another standstill, and the parties' conflict escalated to the point that North State once again demobilized, and the Town considered default:

46. On September 1, 2020, representatives of North State, AMT, Dominion, and NCDOT met on site to discuss the gas line conflicts. Everyone agreed the Dominion gas lines were in conflict with the planned drainage system in the northwest and southwest quadrants of the intersection. Some of the gas lines blocked the drainage system as designed; and, if the intersection was realigned as designed, some of the gas lines would lie dangerously close to the road surface.

47. The Dominion representative told the Town it had two options if it wanted to continue the Project: completely redesign the plans or have Dominion relocate the gas lines in conflict with the planned drainage system. (The Dominion representative said there had been a meeting between the Town and Dominion on site two years earlier, and the Town's representative had told Dominion there were no conflicts between Dominion's lines and the planned drainage system.)

48. North State cleaned up the erosion control on site,

demobilized, and left the site on September 4, 2020.

49. On September 11, 2020, the North State supervisor sent the [Project E]ngineer a lengthy and detailed email explaining why North State was prevented from progressing on the Project and requesting a suspension of the Project retroactive to February 2020.

50. The [Project E]ngineer replied "Thanks Chris. Yes this is what I was looking for- laying everything out from the contractor's perspective so we can address each issue point by point and figure out together how to go about getting the work completed."

51. On September 11, 2020, the Town sent North State a letter stating the Town was contemplating default.

(Internal citations omitted).

By this point, as the trial court adroitly summarized, there were utility conflicts preventing North State from working in all four quadrants of the Project work site:

> 52. North State could not work in the *northeast quadrant* of the Project because an underground AT&T line conflicted with driveway pipes in the plans. Any other work in that quadrant would have been out of the plans' sequence and would have sent storm water toward the basement of a nearby residence.
>
> 53. North State was prevented from performing the planned work in the *northwest quadrant* because multiple gas lines blocked installation of the pipes and boxes in the drainage system as designed.
>
> 54. North State could not work in the *southeast quadrant* because the existing drainage system sent storm water through the quadrant, and, if North State brought in more fill as suggested by AMT, it would cause the intersection to flood.

55. North State could not work in the *southwest quadrant* because gas lines and signal poles blocked installation of the pipes and boxes of the planned drainage system.

(Emphases added) (internal citations omitted).

Nevertheless, the Town proposed additional work for the Project that North State could perform, although beyond the scope of the Contract:

56. The Town and AMT believed in September 2020 that Kemp could re-design its plans to avoid the gas line conflicts. To that end, they suggested North State do exploratory digging in the intersection.

57. Exploratory digging was outside North State's scope of work in the Contract. And North State had already potholed in the areas where AMT and the Town wanted the exploratory digging to be done.

(Internal citations omitted).

The parties were at a deadlock, with the Town ultimately refusing to terminate the Contract and defaulting North State:

60. The Town's principal engineer never went to the site while North State was working on the Project.

61. North State's attorney asked the Town to meet on site with AMT, Kemp, and the utility companies to find solutions to the utility conflicts. Alternatively, the attorney asked that the Contract be terminated pursuant to Standard Specification § 108-13.

62. The Town refused to meet and rejected North State's request to terminate the Contract.

63. On October 5, 2020, North State's supervisor sent the [Project E]ngineer an email requesting updates on the relocation of the gas line, AT&T line, and overhead utility lines. [The Project E]ngineer never responded.

64. The Town defaulted North State on October 21, 2020.

(Internal citations omitted).

North State filed a complaint against the Town on 27 April 2021, which it amended on 3 November 2021. North State alleged that the Town breached the Contract and sought damages as well as a declaration that the Contract had been terminated. Meanwhile, the Town maintained its interest in completing the Project; yet, it was ultimately forced to ask Dominion to relocate its gas lines:

> 66. After it had defaulted North State, and North State had left the site, the Town, including its principal engineer, met with AMT, NCDOT, Dominion, and other utilities and discussed how to complete the Project.
>
> 67. After it defaulted North State, the Town did not immediately attempt to relet the Project.
>
> 68. The Town did not order further surveying of the Project area until March 3, 2021.
>
> 69. Ultimately, NCDOT rejected the Town's new plan to work around the gas line conflicts in the intersection. For instance, the planned drainage pipe under Campus Lane still could not be installed due to a gas line conflict that prevented the pipe from being placed in that location.
>
> 70. In 2022, the Town asked Dominion to relocate its gas lines.
>
> 71. In May 2022, Dominion relocated the gas lines in the intersection. The gas lines and new regulator station were moved completely out of the Project area.
>
> 72. Kemp completed its new plans in March 2022.
>
> 73. The new drainage summary (used to order precast pipes and boxes) in Kemp's plans was materially different

> from the drainage summary in the original plans dated March 12, 2018.
>
> 74. The new plans incorporated the work completed by North State.

(Internal citations omitted).

On 13 December 2021, the Town filed its answer and counterclaims, in which it alleged that North State breached the Contract and sought damages as well as liquidated damages. Both parties moved for summary judgment on 5 May 2023; the trial court denied the parties' motions on 30 May 2023.

This matter came on for bench trial in Iredell County Superior Court on 13 June 2023. On 10 July 2023, the trial court entered its judgment, which included the above-quoted findings of fact and the following conclusions of law:

> 2. The Town materially breached the parties' contract.
>
>> a. The Town failed to identify and "make arrangements for the necessary adjustments of all affected public or private utility facilities," as required by . . . Standard Specification §[ ]105-8.
>>
>> b. The Dominion gas lines in conflict with the planned drainage system were affected public utilities.
>>
>> c. The Town is responsible for the mistakes and omissions of Kemp, Stewart, and AMT, each of which was an agent of the Town, acting in the normal course of its employment.
>>
>> d. The Town consciously and repeatedly refused to acknowledge and deal with the substantial conflicts posed by the Dominion gas lines. NCDOT rejected the Town's redesigned plans because they would not resolve the gas line conflicts. In essence, NCDOT had to force the Town to

ask Dominion to relocate its gas lines.

e. The Town failed to pay North State sums owed under the Contract for work satisfactorily completed.

3. The Town's breach of contract caused North State to suffer actual damages totaling $132,657.40.

a. North State is entitled to be paid for the work it satisfactorily completed on the Project.

b. The Town breached the Contract by not paying North State for pay applications 3 and 4.

4. The Town should have terminated the Contract pursuant to Standard Specification §[ ]108-13(A)(2) . . . .

b. North State could not complete the work in accord with the Contract because of unanticipated conditions at the site.

c. The Project could not be completed without a major relocation of the Dominion gas lines.

d. North State would have been unduly delayed in completing the [P]roject by reason of the unanticipated conditions and the necessary changes in the plans' design.

e. The Town's refusal to terminate the Contract was unreasonable and amounts to an abuse of its discretion.

5. North State did not breach the parties' contract.

a. The Town's failure to meet the requirements of §[ ]105-8 was a material breach of the parties' contract. The Town's breach excused further performance by North State and prevented North State from performing its obligations under the Contract.

b. The Town was not justified in defaulting North State.

6. The Town is not entitled to recover compensatory

damages from North State.

> 7. The Town is not entitled to recover liquidated damages from North State. The Town and its agents caused the delays in the completion of the Project by their actions, omissions, negligence, and delays. Standard Specification §[ ]108-11.

The court entered judgment against the Town "in the principal amount of $132,657.40 plus interest at the judicial rate from October 21st, 2020." As of the entry of the judgment, the Project was "not yet completed."

The Town timely filed notice of appeal.

## II. Discussion

The Town primarily argues on appeal that the trial court "erred when it declined to give effect to the Authority of Engineer term" in the Contract. (Internal quotation marks omitted). It further argues that the court erred by finding that the Town breached the Contract and that North State did not. We disagree.

## A. Standard of Review

"When reviewing a judgment from a bench trial, our standard of review is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." *Carolina Marlin Club Marina Ass'n v. Preddy*, 238 N.C. App. 215, 220, 767 S.E.2d 604, 608 (2014) (cleaned up), *disc. review denied*, 368 N.C. 279, 776 S.E.2d 193 (2015). "The trial court's findings of fact are binding on appeal if there is competent evidence to support them, even if there is evidence to the contrary." *Id.* (cleaned up).

Unchallenged findings of fact are binding on appeal. *Id.* at 221, 767 S.E.2d at 608.

"An issue of contract interpretation is a question of law" that this Court reviews de novo. *D.W.H. Painting Co. v. D.W. Ward Constr. Co.*, 174 N.C. App. 327, 330, 620 S.E.2d 887, 890 (2005).

**B. Analysis**

The Town argues that the trial court erred "because its contract interpretation overlooked the Authority of Engineer term altogether. The court made no findings about the term, nor did it make any findings about Stephenson's vital role as the project engineer." (Internal quotation marks omitted).

As our Supreme Court has explained, disputes in construction cases—such as the case at bar—may initially be referred to a project architect or engineer:

> In building and construction contracts the parties frequently provide that the completion, sufficiency, classification, or amount of the work done by the contractor shall be determined by a third person, usually an architect or engineer. Such stipulations which, in their origin, were designed to avoid harassing litigation over questions that can be determined honestly only by those possessed of scientific knowledge, have generally been held valid. This is true even though the architect or engineer is employed by the owner . . . .

*Welborn Plumbing & Heating Co. v. Randolph Cty. Bd. of Educ.*, 268 N.C. 85, 89–90, 150 S.E.2d 65, 68 (1966) (citation omitted). "[W]here the parties stipulate . . . that the determination of the architect or engineer shall be final and conclusive," it is well settled that "both parties are bound by his determination of those matters which he

is authorized to determine, except in case of fraud or . . . gross mistake." *Id.* at 90,

150 S.E.2d at 68 (citation omitted).

Here, the Authority of Engineer Term vested the Project Engineer with the

final authority to resolve certain disputes:

> The [Project] Engineer will decide all questions which may
> arise as to the quality and acceptability of work performed
> and as to the rate of progress of the work; all questions
> which may arise as to the interpretation of the contract;
> and all questions as to the acceptable fulfillment of the
> contract on the part of [North State]. H[er] decision shall
> be final and [s]he shall have executive authority to enforce
> and make effective such decisions and orders as [North
> State] fails to carry out promptly.

But rather than overlooking the Authority of Engineer Term, as the Town

asserts, the trial court properly recognized that the term is inapplicable to the

dispositive issues in this case: whether the Town breached the Contract, and if so,

whether such breach excused any responsive breach by North State. *See McClure*

*Lumber Co. v. Helmsman Constr., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239

(2003) ("As a general rule, if either party to a bilateral contract commits a material

breach of the contract, the non-breaching party is excused from the obligation to

perform further.").

Recognizing this flaw in its argument, the Town argues in its reply brief that

it did not breach Standard Specification § 105-8's "plain terms," which it maintains

did "not impose a non-delegable duty on [the Town] to locate every utility or forbid

assignment." The Town asserts that it did " 'notify' known affected utilities and

adjust[ed] work as needed before or during construction"—an assertion flatly contradicted by the trial court's unchallenged findings (1) that "[n]one of the utility conflicts known to the Town in February 2020 had been resolved by May 22, 2020," and (2) that the Town consistently ignored or rejected North State's concerns about the numerous utility conflicts until—and even after—North State requested that the Contract be terminated for impossibility and the Town defaulted North State.

The Town further contends that the Project Engineer told North State that she interpreted Standard Specification § 105-8 as requiring "North State to perform certain exploratory digging" and that "[s]he also told North State, on multiple occasions, that it could work in the area while the engineers resolved the utility conflicts." However, this appeal to the Project Engineer's opinions is unavailing.

First, as quoted above, the Authority of Engineer Term covers a limited set of issues. North State aptly notes that the Project Engineer "is not given authority to determine whether the Town, as opposed to North State, has fulfilled its obligations under the Contract." That determination is therefore within the ambit of the trial court, not the Project Engineer—and the Town's breach "relieved [North State] from the obligation to perform." *Ball v. Maynard*, 184 N.C. App. 99, 108, 645 S.E.2d 890, 897, *disc. review denied*, 362 N.C. 86, 656 S.E.2d 591 (2007).

Moreover, the Project Engineer's own testimony belies the Town's confidence that her opinion favors it. At trial, the Project Engineer testified that she was "not sure whether or not it was impossible" for North State "to work around" the utility

conflicts; that "North State complied with [§] 105-8 as far as potholing the utilities"; that the exploratory digging that the Town suggested North State perform was "outside of the scope of" the Contract and would have required a supplemental agreement; and that it was not "possible" for her to judge whether either party had breached the Contract and owed damages to the other. Thus, insofar as the Town leans on the Project Engineer's favorable opinion for support in this matter, such reliance is misplaced.

Notably, the Town has not challenged any of the trial court's thorough and detailed findings of fact, many of which are quoted above, which are thus binding on appeal. *See Carolina Marlin Club*, 238 N.C. App. at 221, 767 S.E.2d at 608. Instead, the Town challenges the trial court's conclusions that the Town (1) "consciously and repeatedly refused to acknowledge and deal with the substantial conflicts posed by the Dominion gas lines," and (2) "should have terminated the Contract pursuant to Standard Specification §[ ]108-13(A)(2)." However, as these arguments are also based on the trial court's supposed overlooking of the Authority of Engineer Term, they lack merit for the reasons explained above.

The Town also challenges the trial court's conclusion that the Town was "responsible for the mistakes and omissions of Kemp, Stewart, and AMT, each of which was an agent of the Town, acting in the normal course of its employment." The Town undergirds this challenge with the assertion that "[i]n general, a municipality is not liable for actions taken by its independent contractors." To support this

proposition, the Town cites a series of cases. *See Drake v. City of Asheville*, 194 N.C. 6, 138 S.E. 343 (1927) (personal injury); *City of Winston-Salem v. Ferrell*, 79 N.C. App. 103, 338 S.E.2d 794 (1986) (inverse condemnation); *Horne v. City of Charlotte*, 41 N.C. App. 491, 255 S.E.2d 290 (1979) (property damage). In so doing, the Town misapprehends the import of the challenged conclusion. The Town was not being held liable under any of these theories for the actions taken by its independent contractors; rather, this conclusion—and the unchallenged findings of fact upon which it is based—supports the trial court's determination that the Town breached the Contract.

"Municipal contracts are measured by the same tests and are subject to the same rights and liabilities as are other contracts. It follows that a city may be sued on its valid contracts . . . ." 10A Eugene McQuillin, *The Law of Municipal Corporations* § 29:134 (3d ed., rev. vol. 2018) (footnote omitted). "Thus, it is established that, if a contract has been violated by the municipality, the other party may at once sue to recover damages for its breach . . . in the same manner as though the contract had been made with an individual, firm or private corporation." *Id.* (footnote omitted); *see also Knotville Vol. Fire Dep't v. Wilkes County*, 94 N.C. App. 377, 379, 380 S.E.2d 422, 423 (recognizing that local governments, "no less than others, are legally bound by their valid contracts"), *disc. review denied*, 325 N.C. 432, 384 S.E.2d 538 (1989).

In that a municipality's alleged breach of a valid contract may be determined using ordinary contract principles, North State directs us to *Brown v. Bowers*

*Construction Co.*, in which our Supreme Court recognized that a contractor could not "escape by assignment" of its contractually obligated duties to a subcontractor. 236 N.C. 462, 469, 73 S.E.2d 147, 152 (1952). "The assumption of the assignor's duty by the assignee merely gives to the other party a new and added security." *Id.* at 470, 73 S.E.2d at 152. We agree with North State that the Town can no more "escape by assignment" its contractually obligated duties than can any other contracting party. *Id.* at 469, 73 S.E.2d at 152. The Town's argument concerning purported liability for its agents accordingly misses the mark.

Further, even if we assume, *arguendo*, that the trial court erred by concluding that the Town was "responsible for the mistakes and omissions of Kemp, Stewart, and AMT," the court's remaining conclusions of law amply support its determination that the Town breached the Contract, thereby excusing North State from its contractual obligations. Ultimately, "there is competent evidence to support the trial court's findings of fact and . . . the findings support the conclusions of law and ensuing judgment." *Carolina Marlin Club*, 238 N.C. App. at 220, 767 S.E.2d at 608 (citation omitted). The Town's various arguments to the contrary are meritless.

## III.    Conclusion

For the foregoing reasons, the trial court's judgment is affirmed.

AFFIRMED.

Judges GRIFFIN and FLOOD concur.